# HYDE *v.* UNITED STATES.*

CRIMINAL LAW; CONSPIRACY TO DEFRAUD UNITED STATES; INDICTMENT; JOINDER OF COUNTS; ELECTION BY PROSECUTION; BILL OF PARTICU-LARS.

1. On a demurrer to an indictment for conspiracy, containing a large number of counts, where it is uncertain whether it was the intention to charge only one conspiracy with different overt acts set forth in the several counts, or to charge different conspiracies in the several counts with different overt acts as to each, the demurrer will be considered as if each count alleged a distinct conspiracy.

2. An indictment for conspiracy to defraud the United States out of public lands is not necessarily demurrable because it joins forty-two different and independent charges of conspiracy; sec. 1025, U. S. Rev. Stat. (U. S. Comp. Stat. 1901, p. 720), sanctioning the joinder of several charges for the same act, or two or more acts of the same class, in one indictment, not limiting the discretion of the pleader or grand jury to any number of counts. It is within the discretion of the trial court to determine whether the defendants will be embarrassed or prejudiced if required to defend all the charges in one trial, and, if so, to require the prosecution to elect on which counts to proceed. (Following *Lorenz* v. *United States,* 24 App. D. C. 367.)

3. While an indictment for conspiracy must specify the conspiracy with certainty, and while, if it insufficiently charges the conspiracy, averments of overt acts done in furtherance of the objects of the conspiracy cannot cure such insufficiency, the description in the indictment does not need to be any more definite and precise than the proof of the crime.

4. An indictment which charges the defendants with conspiracy to defraud the United States out of the title to large tracts of public lands in California and Oregon, open and to be open to selection, and with overt acts in selecting and acquiring specified tracts of land, is sufficient without alleging that the defendants conspired to defraud the United States out of any particular tracts of land. It is not essential

---

*See *Benson* v. *United States, ante,* 331.—Reporter.

to the crime, that at the time of the conspiracy the defendants had in mind any particular tracts of land out of which they intended to defraud the United States.

5. An indictment to defraud the United States out of public lands open and to be open to selection in California and Oregon is not too vague and uncertain as to the means to be used to effect the alleged fraud, where it charges that school lands were to be obtained fraudulently from those States by and on behalf of H. and B., two of the defendants, in the names of fictitious persons, upon applications to purchase, to be filed in the names of such fictitious persons, and, upon assignments of certificates of purchase, to be issued upon applications to purchase, to be filed in the names of real persons not qualified to purchase; and such school lands were to be relinquished, transferred, and conveyed, by means of false and forged relinquishments, assignments, and conveyances, to the United States, either directly in the names of such fictitious persons, or indirectly either through H., or through agents and attorneys of H. and B., to real persons, in exchange for public lands to be selected, and for titles thereto by patent to be obtained, by and on behalf of H. and B., in the names of such fictitious or real persons; and school lands were to be obtained fraudulently from such States by and on behalf of H. and B., in the names of real persons, upon assignments of certificates of purchase, to be issued upon applications to purchase, to be filed in the names of fictitious persons, and upon assignments of certificates of purchase, to be issued upon applications to purchase, to be filed in the names of real persons not qualified to purchase, and upon applications to purchase to be filed in the names of real persons not qualified to purchase, where there were to be no assignments of the certificates of purchase; and such school lands were to be relinquished, transferred, and conveyed to the United States, either directly or indirectly, through H., or through the said agents and attorneys of H. and B., in exchange for public lands to be selected, and for titles thereto, by patent to be obtained, by and on behalf of H. and B., in the names of real persons; and further, that the defendants were, by bribery, to induce certain officials of the government to aid the defendants to hasten the approval of their fraudulent selections, in advance of their regular order, and to inform the defendants respecting any investigation of their said fraudulent practice, and by like means to induce forest-reserve officials to aid the defendants to secure the establishment of new forest reserves, and the extension or reduction of forest reserves already established.

6. Where the second and subsequent counts of an indictment for conspiracy to defraud the United States out of public lands selected and to be selected charged that the conspiracy was entered into "under circumstances and conditions set forth in the said first count;" that the defendants conspired to defraud the United States out of the title to

public lands "by obtaining from the said United States by means of the false and fraudulent practice described in the said first count;" and appropriating such title for their benefit "as in the said first count set forth," and "that, in pursuance of the said unlawful conspiracy," and "to effect the object of the same," the alleged overt act was done; and that the described public lands were selected by the defendants "in pursuance of the same fraudulent practice and in the manner and by the means in said first count set forth,"—the references in such second and subsequent counts to the matter in the first count are sufficiently full to incorporate such matter into them, so as to make unnecessary the repetition of the language of the first count in the succeeding counts. (Following *Lorenz* v. *United States,* 24 App. D. C. 363, and *Benson* v. *United States, ante,* 331.)

7. It is not the office of an indictment to set out the evidence, but it is within the discretion of the trial court in a proper case to require the prosecution to furnish the defendants with a bill of particulars of the evidence intended to be relied on.

No. 1650. Submitted March 22, 1906. Decided April 6, 1906.

HEARING on an appeal (specially allowed) by two of several defendants from an order of the Supreme Court of the District of Columbia, overruling demurrers to an indictment for conspiracy to defraud the United States.         *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is a special appeal allowed from an interlocutory order overruling demurrers to an indictment against Frederick A. Hyde, John A. Benson, Henry P. Dimond, and Joost H. Schneider. The crime charged against these defendants is a conspiracy to defraud the United States out of the possession of and the title to various large tracts of its public lands in California and Oregon.

The indictment is 94 pages in length and contains 42 counts, the first and most important of which covers 8 pages of the record. An explanatory statement of congressional legislation and of certain aspects of the land laws will enable us to shorten this discussion. The act of March 3rd, 1891, section 24 (26 Stat. at L. 1095, 1103, chap. 561, U. S. Comp. Stat. 1901, pp. 1535, 1537), empowered the President from time to time to set

apart and reserve in any State or Territory having public land
bearing forests, in any part of the public lands, wholly or in part
timber, lands as public reservations; and, by proclamation, to
establish and define the limits of such reservations.   The act of
June 4th, 1897 (30 Stat. at L. 11, 36, chap. 2, U. S. Comp. Stat.
1901, p. 3768), added that, where a tract covered by an un-
perfected bona fide claim, or by a patent, is included within the
limits of the public-forest reservation, the settler or owner
thereof may relinquish such tract and select in lieu thereof
vacant land open to settlement not exceeding in area the tract
covered by his claim or patent, and do so without charge, credit
being allowed for the time spent by him on the relinquished
claims.   The establishment of forest reserves had steadily
progressed, and yearly large areas and small were withdrawn
to preserve the remaining forests on public land and to protect
forests within such reservations for the purpose of maintaining
conditions favorable to continuous water flow, and to preserve
a permanent timber supply for the uses of the people.   The last-
mentioned act was to tempt settlers in forest reserves to ex-
change their locations for lands still open to settlement.   The
Land Office construed the phrase "covered by his claim or
patent" to embrace any tract, the fee simple title to which had
passed out of the United States by any means which are the
legal equivalent of a patent.

From an early period Congress granted school lands to the
various States wherein lay public lands, and usually sections 16
and 36, as is the case in California and Oregon, became school
lands.   The title to school lands passes by the grants when the
lands are identified by survey, and therefore patents of the
United States are not necessary to convey such title.   *Cooper*
v. *Roberts,* 18 How. 173, 15 L. ed. 338; *Beecher* v. *Wetherby,*
95 U. S. 517, 24 L. ed. 440.   The General Land Office, under
the act of June 4th, 1897, held that surveyed school lands with-
in forest reservations are within the meaning of the term
"covered by a patent" in this act.   The California Political
Code, sections 3494, 3495, and 3500, so far as we here need to
speak, governs the disposal of school lands granted to that
State.   These sections provide (1) that a purchase of school

lands can be legally made only by a person desiring the land *for his own use and benefit* and for the benefit of *no other person or persons whomsoever,* and who has made no contract or agreement to sell the land; (2) the applicant's affidavit must show these essential conditions; (3) and *any false statement* in the affidavit defeats the applicant's right to purchase, (4) and not exceeding 640 acres may be purchased by any one person.

The statutes of Oregon regulating the sale of school lands granted to that State are like those of California, except that only 320 acres may be sold to any one person. 2 Hill's Anno. Laws (Or.), sections 3617, 3618. The supreme courts of California and Oregon have steadily held that all facts which the applicant for purchase is required to set out in his affidavit must be true, else the proceedings will be invalid.

The statutes of both States provide that certificates of purchase shall be issued to persons who have applied to purchase school lands upon the required cash payment being made, and that such certificates of purchase and all rights acquired thereunder may be sold by deed or assignment executed and acknowledged in the manner required for other conveyances of real estate; and, upon the surrender of such certificates of purchase by the original holders or by their assignees, accompanied by payment of the balance of the purchase money, patents shall be issued to the original holders or the assignees, as the case may be. Pol. Code (Cal.) secs. 3514, 3515, 3519; Hill's Anno. Laws (Or.) sec. 3605. The aforegoing will be helpful to an understanding of the description in the indictment of the several means which were to be used by the alleged conspirators to obtain school lands from these two States, and, in connection with the filing of applications to purchase such lands, the use of the words "assignment of the same, and of the certificates of purchase thereof."

The first count of this indictment alleges that on October 24th, 1901, and from thence until February 1st, 1904, the defendants, Hyde and Benson, were engaged at San Francisco in the business of obtaining from the United States title to its public lands outside of forest reserves in lieu of school lands lying within them, by Hyde and Benson, obtained from the

States of California and Oregon; that Dimond was their attorney in this business, Schneider their employee therein, and Harlan and Valk employees in the General Land Office with duties pertaining to the exchange of lands outside of forest reserves in lieu of lands within; that Allen was a forest superintendent, and Taggart a forest supervisor in the public land service of the United States.

That Hyde, Dimond, Benson, and Schneider, on December 30th, 1901, in the District of Columbia, unlawfully did conspire, combine, confederate, and agree, together with other persons to the grand jurors unknown, knowingly, wickedly, and corruptly to defraud the United States out of the title to "divers large tracts of the public lands of the United States open and to be open to selection    *    *    *    in lieu of lands included and to be included within the limits of forest reserves    *    *    *    in the said States of California and Oregon," by obtaining for their own benefit from the United States such title "in pursuance and by means of a false and fraudulent practice whereby Hyde and Benson were to obtain fraudulently from the States of California and Oregon title to school lands within such forest reserves and open to purchase from those States by residents."

(a) By application for purchase, assignment of same and of certificates of purchase (1) in the names of *fictitious* persons, (2) and in the names of *persons not really desiring and not qualified to purchase,* supporting such applications with forged and fraudulent affidavits and false affidavits.

(b) As part of the fraudulent practice, Hyde and Benson were to cause to be relinquished, assigned, transferred, and conveyed, by means of false and forged relinquishments, assignments, and conveyances to the United States, directly or indirectly through Hyde, or other divers agents of Hyde and Benson, the pretended rights of such *fictitious* persons, and require and procure such *real* persons to make relinquishments, assignments, transfers, and conveyances directly or indirectly through Hyde, or through the agents of Hyde and Benson, to wit, Clark, Baldwin, Liebes, and Dimond, to the United States, of the titles to such school lands so, by the use of the names of

*such real* persons, fraudulently to be obtained from the said States, and thus in either case in exchange for public lands to be selected, and for titles thereto by patent to be obtained by and on behalf of Hyde and Benson in the names of such *fictitious* persons or *real* persons or in the names of Hyde, Clark, Baldwin, Liebes, Dimond, or Hyde & Company, from the public lands in lieu of such school lands within forest reserves.

(c) Hyde and Benson were in like manner to exchange school lands already before the said period obtained by them from the said States in the same fraudulent manner for public lands lying outside of forest reserves.

(d) Hyde and Benson were, during said period, to induce and procure, and take advantage of the fact that they had before the said period induced and procured, Harlan and Valk, employees of the General Land Office, by paying them money for that purpose, corruptly to furnish Hyde and Benson information concerning the status in the Land Office of all matters pertaining to their said business, and to expedite, contrary to their duty, the matters in the Land Office in behalf of Hyde and Benson by securing the approval thereof in advance of the due course of business.

(e) Hyde and Benson during said period were to induce and procure, and take advantage of the fact that they had before the said period induced and procured, Allen and Taggart, forest officials, corruptly and contrary to duty to furnish Hyde and Benson information by them as officials gathered, to allow Hyde and Benson to make for them such official reports and recommendations as should be to the interest of Hyde and Benson, and then to transmit such reports so prepared to their superior officers.

(f) And as the final part of the alleged fraudulent practice, that Dimond, as attorney for Hyde and Benson, was to assist them in their business by appearing in their behalf before the proper officers of the Department of the Interior and the General Land Office and urge speedy action by such officers, Dimond well knowing the fraudulent character of said business and that his acts as attorney were done in pursuance of the un-

lawful conspiracy; and Schneider, as the employee of Hyde and Benson, was to assist them in obtaining from California and Oregon the fraudulent, fictitious, and worthless titles to school lands by negotiating with the persons willing to sell and allow the issue of their names, and of forging and procuring to be forged the necessary documents for securing titles to such lands from the said States in the names of fictitious persons, and for relinquishing and conveying the same to the United States, Schneider well knowing the fraudulent character of these documents for the purpose for which they were to be used.

The first count proceeds to allege as an overt act that, in pursuance of the unlawful conspiracy, and to effectuate the object thereof, and to defraud the United States of the title to a tract of land in the State of Washington here accurately described, shortly before, in pursuance of the said fraudulent practice, selected in the name of Crawford W. Clark, by and on behalf of Hyde and Benson, in lieu of certain school lands before obtained by Hyde and Benson from Oregon and California in pursuance of the said fraudulent practice and by the means aforesaid, which tracts are particularly described, the defendant, Dimond, on December 30th, 1901, unlawfully presented to the Commissioner of the Land Office a certain letter here set out in full, and which purports to be an appearance by Dimond as attorney for Clark concerning his forest-reserve lieu selection, which letter was so presented in pursuance of the unlawful conspiracy.

We have fully set out the alleged fraudulent practice as described in the first count, because counts two to thirty-four inclusive are identical in form, except that to the conspiracy different dates are assigned, and in each count a different tract of school land and a different tract of selected land is described, and that, in addition to Dimond's notice of appearance as an overt act, some of the counts allege that other letters urging action on the application, or inclosing documents to supply some defect therein, were sent to the General Land Office. In each count from two to thirty-four inclusive it is alleged that Hyde, Benson, Dimond, and Schneider, at a date assigned and at Washington in the District of Columbia, "under the circumstances

and conditions set forth in the said first count, unlawfully did conspire, combine, confederate, and agree together and with divers other persons to the grand jurors unknown, knowingly, wickedly, and corruptly to defraud the said United States out of the possession and use of and title to divers large tracts of the public lands open and to be open to selection, in lieu of land included and to be included within the limit of forest reserves established and to ·be established, under the laws of the said United States in that behalf, in the States of California and Oregon, by obtaining from the said United States, by means of the false and fraudulent practice described in the said · first count, and appropriating for the private gain and use of themselves ·as in the said first count set forth, such possession, use, and title; that in pursuance of said unlawful conspiracy, combination, confederation, and agreement, and to effectuate the object of the same, and to appropriate and defraud the said United States out of the possession and use of and the title to a certain tract of · the public land aforesaid,—that is to say (and here a particular tract is described), "in pursuance of the said fraudulent practice, in lieu of certain school lands before then obtained" by Hyde and Benson from the State of Oregon "in pursuance of the same fraudulent practice, and in the manner and by the means in the said first count set forth," lands lying within the limits of a forest reserve. Then follows the allegation of the overt act.

The counts from 35 to 42, inclusive, are identical in form, except that, instead of an overt act relating to selected land and letters concerning the same, these counts allege that, in pursuance of the conspiracy to defraud the United States out of the title to the tracts of public land described in the several counts from the first to the thirty-fourth, inclusive, in some 'counts that said John A. Benson at a date named at the same place "unlawfully did pay to the said Woodford D. Harlan, mentioned in the said first count, money, and in another count at a date assigned and with identical verbal description paid money to William E. Valk.

*Mr. R. Golden Donaldson* and *Mr. A. S. Worthington* for the appellant Hyde.

*Mr. Frank H. Platt, Mr. J. C. Campbell,* and *Mr. R. Golden Donaldson* for the appellant Benson.

*Mr. D. W. Baker,* United States Attorney for the District of Columbia, *Mr. Frances J. Heney,* Special Assistant to the Attorney-General, and *Mr. Arthur B. Pugh,* Special Assistant to the United States Attorney, for the United States.

*Mr. Justice* McComas delivered the opinion of the Court:

Of the assignments of error it is necessary for us to consider seven, and these really involve but three questions which will be considered in order, for these embrace the material objections urged by defendant's counsel to this indictment, presented by the counsel for John A. Benson and by the counsel for Frederick A. Hyde.

1. This indictment is said to be fatally defective in that it improperly joins and unites 42 different and independent charges of conspiracy to the great prejudice of defendants.

Each count of the indictment, it is true, alleges the formation of a conspiracy to defraud the United States out of public land by a fraudulent practice. The second and each subsequent count refers to the first count for the precise description of this alleged fraudulent practice, and each count lays a separate date, and separate counts lay a different date of the formation of the conspiracy. Each of the forty-two counts purports to charge an independent and separate conspiracy. It is true that the indictment shows that of the tracts of the public land alleged to have been selected in the first 34 counts 31 were selected in the names of one of two persons, Frederick A. Hyde and C. W. Clark, and this circumstance suggests that the pleader has only varied the form and substantially relies upon one conspiracy, while the means and methods of the alleged fraudulent conspiracy fully set out in the first count indicates that it may be found at the trial the defendants are called

upon to defend themselves against one and the same conspiracy. The indictment itself on these demurrers should be here considered as if each count alleged a distinct conspiracy entered into by the same persons in the same manner and by the same means with the same object, namely, to defraud the United States out of public land. We think the argument urged before us that it would be a great hardship upon the defendants to be called upon to answer to 42 conspiracies is an argument which the trial court below should and would weigh carefully. It is within the power of that court, if advised that the government prosecutes as for one conspiracy, to compel the government to elect upon which counts it will go to trial. "The application for a prosecutor to elect is an application to the discretion of the judge, founded on the supposition that the case extends to more than one charge, and may therefore be likely to embarrass the prisoner in his defense." *Reg.* v. *Trueman,* 8 Car. & P. 727; *Pointer* v. *United States,* 151 U. S. 396, 402, 38 L. ed. 208, 211, 14 Sup. Ct. Rep. 410.

We are here reviewing the judgment of the learned court below overruling the demurrers to all counts of this indictment. Section 1024, Rev. Stat. (U. S. Comp. Stat. 1901, p. 720), sanctions an indictment in this form, and provides that where there are several charges against any person for the same act or transaction, or for two or more acts or transactions connected together, or for two or more acts of the same class of crimes or offenses which may be properly joined, instead of having several indictments the whole may be joined in one indictment in separate counts. That section does not limit the discretion of the pleader or grand jury to any number of counts. It is not for us here to require the government to elect; it may or may not be the duty of the trial court to so require. This objection, in this instance, is not ground whereon we should sustain these demurrers. In *Benson* v. *United States, ante,* 331, this court said: "The Supreme Court has repeatedly sanctioned the joinder of offenses where the different acts or transactions were not so clearly of the same class of offenses as are those joined in the different counts of this indictment."

"In *Pointer* v. *United States,* 151 U. S. 396, 403, 38 L. ed. 208, 212, 14 Sup. Ct. Rep. 410, the court sustained an indictment containing two counts charging the defendant with committing two murders. The court quotes Archbold, who says that in cases of felony the judge may require the prosecutor to select one, and this is technically termed putting the prosecutor to his election. Archbold (Crim. Pr. & Pl. 8th ed. chap. 3, p. 95) adds: "But this practice has never been extended to misdemeanors." The court proceeds to say: "While recognizing as fundamental the principle that the court must not permit the defendant to be embarrassed in his defense by a multiplicity of charges embraced in one indictment and to be tried by one jury, and while conceding that regularly or usually an indictment should not include more than one felony, the authorities concur in holding that a joinder in one indictment, in separate counts, of different felonies, at least of the same class or grade, and subject to the same punishment, is not necessarily fatal to the indictment upon demurrer, or upon motion to quash, or on motion in arrest of judgment, and does not, in every case, by reason alone of such joinder, make it the duty of the court, upon motion of the accused, to compel the prosecutor to elect upon what one of the charges he will go to trial. The court is invested with such discretion as enables it to do justice between the government and the accused. If it be discovered at any time during a trial that the substantial rights of the accused may be prejudiced by a submission to the same jury of more than one distinct charge of felony among two or more of the same class, the court, according to the established principles of criminal law, can compel an election by the prosecutor. That discretion has not been taken away by section 1024 of the Revised Statutes. On the contrary, that section is consistent with the settled rule that the court, in its discretion, may compel an election when it appears from the indictment, or from the evidence, that the prisoner may be embarrassed in his defense, if that course be not pursued." *Ingraham* v. *United States,* 155 U. S. 434, 436, 39 L. ed. 213, 214, 15 Sup. Ct. Rep. 148; *Williams* v. *United States,* 168 U. S. 382, 390, 42 L. ed. 509, 512, 18 Sup. Ct. Rep. 92.

In a similar case it is said: "It would seem from the case that in this instance the several charges are for the same transaction, or for transactions connected together. They appeared to have occurred at the same time, and were proved by the same witnesses. But, if not, the offenses are similar in character, the challenges are the same, and the punishments alike in kind, differing only in degree, and they are, therefore, of 'the same class of crimes' within the meaning. of section 1024. Whether the joinder was calculated to embarrass the prisoner, and, therefore, the offenses not 'properly joined' within the meaning of the statute, was a question to be determined by the judge in his discretion, on a motion to quash or to compel an election. (*Com.* v. *Birdsall,* 69 Pa. 482, 8 Am. Rep. 283)" *United States* v. *Bennett,* 17 Blatchf. 362, Fed. Cas. No. 14,-572. A pertinent and instructive case is *United States* v. *Howell,* 65 Fed. 402. The court properly overruled the demurrers to the joinder of the counts in this indictment. We do not doubt that, should the defendants be too much embarrassed by them, the defendants may safely prefer their request at the trial of this cause. "Whether such a request should be granted depends upon the special circumstances of the case, and rests in the sound discretion of the trial court." *Lorenz* v. *United States,* 24 App. D. C. 367.

2. Defendants' counsel contend that "each count of the indictment is fatally vague, uncertain, and indefinite, in that it does not contain such a statement of the charge intended to be made against the defendants as will enable them to prepare their defense or to plead an acquittal or conviction as a bar to subsequent prosecution, or enable the court to decide whether the facts alleged are sufficient to support a conviction."

There is no question that the indictment attempts to charge a conspiracy to defraud the United States. In *Hyde* v. *Shine,* 199 U. S. 62, 83, 50 L. ed. 90, 97, 25 Sup. Ct. Rep. 760, the court says of this pleading: "The indictment under section 5440 (U. S. Comp. Stat. 1901, p. 3676) charges a conspiracy to defraud the United States out of the possession, use of, and title thereto, of divers large tracts of public lands; and, if the title to these lands were obtained by fraudulent practices and

in pursuance of a fraudulent design, it is none the less within the statute, though the United States might succeed in defeating a recovery of the State lands by setting up the rights of a bona fide purchaser.  Under the circumstances, it cannot be doubted that the United States might maintain a bill to cancel the patents to the exchanged lands procured by these fraudulent means, notwithstanding its title to the forest-reserve lands might be good."

Defendants' counsel contend that each count of the indictment is fatally defective in that it fails to specify and describe the tracts of land to which the alleged conspiracy relates.  If this be true, it must follow that criminal pleading, which may be readily adapted to ordinary cases is powerless to serve the ends of justice, and to permit the framing of an indictment for a gigantic conspiracy such as is sought to be charged in this indictment.  The indictment must specify with certainty—that is, certainty to a certain intent in general—the conspiracy, because the accused must be advised of the essential particulars of the charge against them, and the court must be able to decide whether the scheme is stated with such particularity that the facts alleged are sufficient to support a conviction.  It is true, also, that, if the indictment insufficiently charges the conspiracy, averment of overt acts done in furtherance of the objects of the conspiracy, and the description of a tract of land as part of the overt act, cannot cure the insufficiency of the indictment in the charge of conspiracy.  Defendants' counsel rely upon a number of cases wherein the conspiracy was to defraud the United States out of specified tracts of public land. When examined, these cases will show that it was the object of the conspiracy charged to procure the particular land and none other.

In *United States* v. *Reichert,* 32 Fed. 147, the conspiracy to defraud the United States out of public lands contained some description, but the lands were described by initial letters of locality and points of the compass, and Justice Field held that indictments should use common words so that one of ordinary intelligence could understand the meaning, and abbreviations, and initials; as, for instance, S. B. M., supposed to denote San Bernado Meridian, was language in the reading of the indict-

ment in the hearing of the accused he could not be expected to understand. The description attempted was bad, but it does not follow that the absence of any description in a case where description of land is impossible, because of the wide range of the conspiracy, is bad because of the case cited.

In each of these counts it is alleged that the defendants with other persons conspired to defraud the United States out of the title to divers large tracts of the public lands open and to be open to selection in lieu of lands included within forest reserves established and to be established in California and Oregon, in pursuance and by means of a false and fraudulent practice whereby Hyde and Benson were to obtain from California and Oregon school lands in such forest reserves, and exchange such school lands for the public lands of the United States. Nowhere in the indictment does it appear that the conspiracy was to secure particular school lands found in forest reserves, and then exchange these for particular lands in the minds of the conspirators. In each count it appears by the over acts that, in pursuance of the conspiracy, the defendants selected certain public lands to be exchanged for certain school lands. It does not appear that such lands were in their minds when they conspired. If the defendants' objection be held good, we must, in effect, hold that the extensive conspiracy charged against these defendants by its dimensions rescues them from punishment designed by this statute, if they are guilty. It is fortunate for the ends of justice in such cases that, "in stating the object of the conspiracy, the same certainty and strictness are not required as in the indictment for the offense conspired to be committed. Certainty to a common intent sufficient to identify the offense which the defendants conspired to commit, is all that is required. When the allegation in the indictment advises the defendants fairly what act is charged as the crime which was agreed to be committed, the chief purpose of pleading is obtained. Enough is then set forth to apprise the defendants so that they may make a defense." *United States* v. *Stevens*, 44 Fed. 132, 141.

The pleader who framed this indictment fully stated the conspiracy as he understood it to exist, and has sufficiently alleged

that the scheme was broad enough to include the purpose of the
defendants to fraudulently obtain title to any public lands of
the United States open and to be open to selection in lieu of
school lands of California and Oregon within forest reserves.
If we must hold the indictment bad because the conspiracy was
as broad as stated, we must admit that the law is inadequate to
compass the indictment and punishment of a conspiracy so
extensive; that the law is adequate to punish a conspiracy to
fraudulently acquire one parcel of public land and inadequate
to punish a conspiracy to acquire a very large number of tracts
of public lands, so numerous that the conspirators themselves
had not yet in mind the lands to be selected by the conspira-
tors.

The Supreme Court has stated the true rule for the pleading
of such a conspiracy as the one described in the indictment be-
fore us. The court says: "The only other matter to which our
consideration is directed is as to the sufficiency of the indict-
ment. It is objected, in the first place, that there is no specifica-
tion of the particular tract or tracts of which the defendants
conspired to defraud the United States. There is nothing more
definite than this, large tracts of land in the county of Rolette,
State of North Dakota, such lands being public lands of the
United States, open to entry under the homestead laws at the
local land office of the United States at Devil's Lake city in
said State. It is true no tract is named by number of section,
township, and range, and the language is broad enough to in-
clude any or all the public lands of the United States situate
within that county, and subject to homestead entry at that land
office. *But manifestly the description in the indictment does
not need to be any more definite and precise than the proof of
the crime.* In other words, if certain facts make out the crime,
it is sufficient to charge those facts, and it is obviously unneces-
sary to state that which is not essential. Can it be doubted
that, if these defendants entered into a conspiracy to defraud
the United States of public lands, subject to homestead entry
at the given office in the named county, the crime of conspiracy
was complete, even if no particular tract or tracts were selected
by the conspirators? It is enough that their purpose and their

conspiracy had in view the acquiring of some of those lands, *and
it is not essential to the crime that, in the minds of the conspira-
tors, the precise lands had already been identified."* Dealy v.
United States, 152 U. S. 539, 543, 38 L. ed. 545, 546, 14 Sup.
Ct. Rep. 680.

And so in the indictment we are considering, where certain
facts make out the crime, it is sufficient to charge those facts;
and when, as here alleged, these defendants entered into a con-
spiracy to defraud the United States of public lands, the crime
was complete, even when no particular tracts were selected by
the conspirators.   It was enough that their conspiracy had in
view the acquiring of some of those lands, and we hold it is not
essential to the crime that, in the minds of the conspirators
the precise lands had already been identified.   It is true that
in *Dealy's Case,* where the court was speaking of public lands
in the indictment there considered, the allegation was that the
defendant conspired to defraud the United States of the posses-
sion of large tracts of lands in Rolette county in North Dakota.
Obviously, there is no geographical limitation to the court's
statement that it is not essential to the crime that the con-
spirators have already identified the lands in their minds.   The
requisite is that the description of the conspiracy in the indict-
ment need not be any more definite and precise than the proof
of the crime, and it is only necessary to charge the facts which
constitute the crime.   Each count in this indictment charges
that the defendants conspired to defraud the United States
out of divers large tracts of the public lands; that is to say,
"some of the tracts of the public lands."   "Divers large tracts"
means, in our opinion, some large tracts.   They conspired to
defraud the United States out of the title to public lands open
and *to be open* to selection.   It is clear in respect of the lands
*to be open,* the conspirators could not have had in mind definite
tracts capable of specific description by the pleader in charging
this conspiracy.   Therefore, we think if, upon trial, the proof
should be that the defendants conspired to defraud the United
States of certain definite tracts of land, that these were agreed
upon and well understood, and that the object of the conspiracy
was to defraud the government of certain particular lands and

none other, the several counts of this indictment do not describe such a conspiracy, and upon such proof there would be a variance. If the proof, however, should be that the conspiracy was of the general character the indictment describes, and that, in pursuance of it, the school lands were to be exchanged "for public lands to be selected," and that "in pursuance of the said unlawful conspiracy," and "in pursuance of the said fraudulent practice, certain tracts described in the first count," for instance, were selected in the name of Crawford W. Clark, we think there would be no variance. As in the case last cited, each count in the indictment here is in form a distinct charge of a separate offense, and hence a verdict of guilty or not guilty as to it is not responsive to the charge in any other count, and a verdict of not guilty as to any one of the counts in this indictment is not necessarily a finding against any conspiracy, but only that the conspiracy and the overt act therein stated did not both exist, while a verdict of guilty upon any other count finds both the conspiracy and the overt act named therein. Upon conviction hereunder, the indictment as a whole would make a clear record of the offense for which the conviction was had, and prove ample protection to defendants from other prosecutions for the particular offenses for which he had been convicted. It is not important that the conspiracy is averred to have been entered into more than two months after Benson and Hyde had engaged in the business, before the defendants, including Hyde and Benson, with others conspired as alleged.

We do not think the indictment too vague and uncertain in its allegations as to the means to be used to effect the alleged fraud. School lands were to be obtained fraudulently from California and Oregon by and on behalf of Hyde and Benson, in the names of *fictitious* persons upon applications to purchase, to be filed in the names of such *fictitious* persons, and upon assignments of certificates of purchase to be issued upon applications to purchase, to be filed in the names of *real persons not qualified to purchase;* and such school lands were to be relinquished, transferred, and conveyed by means of false and forged relinquishments, assignments, and conveyances, to the United

States, either directly in the names of *such fictitious persons,* or indirectly either through the said Hyde, or through divers agents and attorneys of Hyde and Benson, to *real* persons, in exchange for public lands to be selected, and for titles thereto by patent to be obtained, by and on behalf of Hyde and Benson in the names of such *fictitious* or *real* persons; and school lands were to be obtained fraudulently from said States by and on behalf of Hyde and Benson in the names of *real* persons upon assignments of certificates of purchase to be issued upon applications to purchase to be filed in the names of *fictitious* persons, and upon assignments of certificates of purchase to be issued upon applications to purchase to be filed in the names of *real persons not qualified to purchase,* and upon applications to purchase to be filed in the names of *real persons not qualified to purchase,* where there were to be no assignments of the certificates of purchase, and such school lands were to be relinquished, transferred, and conveyed to the United States, either directly, or indirectly through the said Hyde, or through the said agents and attorneys of Hyde and Benson, in exchange for public lands to be selected, and for titles thereto by patent to be obtained, by and on behalf of Hyde and Benson, in the names of *real* persons.

Further, the defendants were, by bribery, to induce Harlan and Valk to aid defendants to hasten the approval of their fraudulent selections *in advance of their regular order,* and to inform defendants respecting any investigation of their said fraudulent practice, and, by like means, to induce forest-reserve officials to aid defendants to secure the establishment of new forest reserves and the extension or reduction of forest reserves already established.

It should be noted that in *Dealy* v. *United States, supra,* in alleging fraudulent means for acquiring public lands, the conspiracy charged embraced both *false* or *feigned* entries and *fictitious* entries. It is complained here that the defendants cannot know which lands were obtained in the names of fictitious persons, which in the names of real persons, and persons not qualified to purchase. We observe, in the Dealy Case, where the court held the indictment good, there was no averment as

to what lands were to be included among the false or feigned entries, or what lands in the fictitious entries. We cannot see how the defendants in this case can be prejudiced thereby. Each count names the person in whose name the land selected was to be acquired, and thereby the United States was defrauded. A careful reading of all the counts shows that in the first 34 counts the land selected by and in the name of a person in lieu of certain school lands, and such person in 16 counts is Hyde or Hyde & Company, and in 15 counts is C. W. Clark; in 1 count the person who selected the land is Isaac Liebes; in 1 count, Elizabeth Dimond, and in the 1 remaining count, A. S. Baldwin. This circumstance lessens considerably the burden of defense.

After a careful consideration of this indictment, we concur with the learned court below that it is not fatally defective because of the objections we have last considered.

3. Finally it is said that "each count of the indictment subsequent to the first count is fatally defective, in that it contains no allegations of the particulars of the alleged conspiracy, and does not contain sufficient words of reference to incorporate the allegations of the first count."

In the case of *Benson* v. *United States, ante,* 331, this court has very recently said concerning an indictment with the feature here objected to: "The references in both these counts to the circumstances and conditions set forth in the first count, referred to, to avoid unnecessary repetition, in our opinion, is sanctioned by the decision of this court in *Lorenz* v. *United States,* 24 App. D. C. 363. See *Blitz* v. *United States,* 153 U. S. 308, 316, 38 L. ed. 725, 728, 14 Sup. Ct. Rep. 924; *Crain* v. *United States,* 162 U. S. 625, 40 L. ed. 1097, 16 Sup. Ct. Rep. 952." We need not repeat here, but we refer to the further discussion of this point in that case.

The references in the counts 2 to 34, inclusive, to the conspiracy and fraudulent scheme set out in the first count are unusually specific. It is charged that the conspiracy was entered into "under circumstances and conditions set forth in the said first count;" that defendants conspired to defraud the United States out of the title to public lands "by obtaining from the said United States, by means of the false and fraudulent practice

described in the said first count," and appropriating such title
for their benefit "as in the said first count set forth," and "that,
in pursuance of the said unlawful conspiracy," and "to effect
the object of the same," the alleged overt act was done; that
the described public lands were selected by defendants "in pur-
suance of the same fraudulent practice and in the manner and
by the means in the said first count set forth."

If we have correctly concluded that the conspiracy is definite-
ly and clearly set forth in the first count, it will be conceded
that, if the same matter setting forth such conspiracy were
repeated in the second count, such second count would be good.
How, then, can the defendant be prejudiced? Mr. Bishop says:
"The reference must be so full and distinct as, in effect, to in-
corporate the matter going before with that in the count wherein
it is made." 1 Bishop, New Crim. Proc. sec. 431; Benson v.
United States, supra.

What prejudice comes to the defendants if the reference
be sufficiently full to incorporate the matter going before with
that in the count to which reference is made, and if reference be
so clear and distinct that the defendant cannot mistake that
which has been read into the second count, assuming that the
conspiracy and fraudulent practice has been properly set out in
the first court? The objection of the defendant here is that
the second count should be complete in itself, and should not
refer to the other count in aid of its averment. Surely this
objection is an objection to form. Essentially it is that the
language in which the conspiracy and fraudulent practice are
set out in the first count should be repeated in the 33 succeed-
ing counts. If it would be good in that form, why is it not good
when incorporated by clear and distinct reference so that the
defendants could not possibly mistake the matter transferred
bodily to the second and succeeding counts. And as was said
in United States v. Jolly, 37 Fed. 108, 111: "Our Revised
Statutes, sec. 1025 (U. S. Comp. Stat. 1901, p. 720), forbid us
to quash the indictment for that defect of form, as I think this
clearly is; and we must therefore amend it by overlooking the
defect, and reading the averments as if the words of the first
count referred to as describing the warrant were inserted in this

second count itself. It is not a technical amendment, but amounts to the same thing." *Wright* v. *United States,* 48 C. C. A. 37, 108 Fed. 811; *Peters* v. *United States,* 36 C. C. A. 105, 94 Fed. 127, 132. In this court such objection has not availed upon demurrer. *Lorenz* v. *United States,* 24 App. D. C. 362. In this last case decided by this court, the reference to the first count held sufficient was even less specific, clear, and full than in the subsequent counts of the indictment we are here considering. See *United States* v. *Peters,* 87 Fed. 987.

What we before said disposes of all the counts save the last five. What we have said in discussing the third main objection to this indictment disposes, in our opinion, of the objection made to the last five counts charging bribery of Harlan and Valk. It is charged that Benson, one of the defendants, paid money "to the said Woodford D. Harlan mentioned in the said first count," and "to the said William E. Valk mentioned in the said first count." We hold that the reference in each count to the fraudulent practice, the scheme, the conspiracy, set forth in the first count are so full, explicit, and unambiguous as to leave no doubt that the allegations of such conspiracy, and nothing more or different, is intended to be incorporated in each of the counts subsequent to the first, that we believe it is plain that the said Harlan and Valk mentioned in the last five counts, are necessarily by the incorporated allegations the same Harlan and Valk described in said first count as employees of the General Land Office in the official relation to the exchange of school lands for public lands of the United States there alleged; therefore we hold these five counts are good.

Many embarrassments which defendants' counsel suggest are likely to happen to these defendants, upon the trial may be obviated by a bill of particulars. The conspiracy alleged in the indictment is so extensive that the trial court may determine, in its discretion, that the defendants should have more adequate notice, and, if so, the trial court has power to require the government to furnish the defendants with a bill of particulars of the evidence intended to be relied on. It is not the office of the indictment to set out the evidence.

For the reasons we have assigned, the interlocutory judgment

of the court below overruling the demurrers and requiring the defendants to plead must be affirmed, and the cause remanded for further proceedings according to law, and it is so ordered.

*Affirmed.*